**RAYMOND, COLESAR, GLASPY & HUSS, P.C., Plaintiff,**

v.

**ALLIED CAPITAL CORPORATION, Defendant.**

Civ. A. No. 3:90CV00625.

United States District Court,
E.D. Virginia,
Richmond Division.

March 20, 1991.

John Charles Thomas, Harry Margerum Johnson, III, E. Milton Farley, III, Hunton & Williams, Richmond, Va., for Raymond, Colesar, Glaspy & Huss, P.C.

Allen Scott Rugg, Kutak Rock & Campbell, Washington, D.C., David P. Parker, Statesville, N.C., for Allied Capital Corp.

## MEMORANDUM AND ORDER

SPENCER, District Judge.

Defendant Allied Capital Corporation ("Allied") has moved to dismiss for lack of personal jurisdiction. Fed.R.Civ.P. 12(b)(2). For the reasons stated in this memorandum, the motion is DENIED.

I

The following describes the factual allegations of the complaint as if true.

Raymond, Colesar, Glaspy & Huss, P.C. ("Raymond, Colesar" or "RCGH") is a Virginia corporation based in Richmond. Allied is a Washington, D.C. corporation with its principal place of business there. Allied is a venture capital company which has arranged or provided financing for many ventures, including Consolidated Auto Recyclers, Inc. ("Consolidated"), a Delaware corporation with its principal place of business in Maine.

Allied's senior vice president Frederick L. Russell, Jr. contacted RCGH in January 1990 about performing accounting services for Consolidated. Russell explained to a RCGH representative[1] that Allied had a substantial investment in Consolidated and was concerned about the company's accounting and financial procedures. He asked RCGH to perform certain accounting and consulting services for Consolidated, and RCGH agreed to do so. RCGH agreed only because Allied had retained it; it would not have accepted the "engagement" without Allied's agreement and participation.

RCGH prepared a "draft engagement letter" for Consolidated, but also sent Russell a copy of the draft. "Russell immediately contacted RCGH and insisted that Allied execute the engagement letter rather than Consolidated." He explained that Allied was "in charge" of the work and had a "substantial interest" in ensuring the accuracy and completeness of the financial data obtained.

Russell asked RCGH to re-draft the engagement letter for his signature, on behalf of Allied. RCGH did this; Russell signed the letter in Allied's Washington office, and returned it to RCGH.

In reliance on Allied's statements and execution of the engagement letter, RCGH began performing services for Consolidated, and continued to do so until August 9, 1990. It obtained several assurances from Allied during that time that it would be paid for the work.

RCGH kept Allied fully informed of the progress on the Consolidated project and consulted with Allied frequently, "often at Allied's request." Allied expressed approval of RCGH's work, and the amount of RCGH's charges for its work, although bills themselves were sent to Consolidated in Maine.

Nevertheless, Allied "suddenly ceased to provide capital to Consolidated." This prompted Consolidated to file a Chapter 11 petition for relief in the Bankruptcy Court for the District of Maine on July 27, 1990.

RCGH then demanded payment for its services from Allied, which refused. The outstanding bill now stands at $125,780.50.

RCGH sues for recovery of this amount under four theories: 1) breach of contract, alleging that the engagement letter constitutes a written contract; 2) breach of guarantee, alleging that Allied's statements and actions, in conjunction with the engagement letter, constitute Allied's guarantee to RCGH that it would be paid for its services to Consolidated; 3) promissory and equitable estoppel, in that Allied represented that Consolidated would be supplied with sufficient capital to pay RCGH, with the intent that RCGH rely on such representations to its detriment by performing services for Consolidated, and RCGH in fact so relied; and 4) quantum meruit, alleging that Allied received $154,418.50 in benefit from the services RCGH rendered, and should not be unjustly rewarded by that benefit without paying for it under a contract implied by law.

1. This was apparently RCGH name partner Archie Glaspy, although the complaint does not indicate who at RCGH communicated with Allied.

## II

Personal jurisdiction in this action is governed by the following provisions of the Virginia "long-arm" statute:

A. A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action *arising from* the person's:

1. Transacting any business in this Commonwealth; ....

B. When jurisdiction over a person is based solely upon this section, *only a cause of action arising from acts enumerated in this section may be asserted against him ....*

Va.Code Ann. § 8.01–328.1 (Cum.Supp. 1990) (emphasis added).

Raymond, Colesar points out that:

[A]llied actively participates in the operation of Virginia companies in which it has invested millions of dollars. Allied derives substantial income from these investments in Virginia companies. Most of Allied's officers live in Virginia. Allied's Registrar and Transfer Agent is located in Richmond. All of Allied's shareholder lists and records of stock transfers are maintained here. Allied has an interest in real property in Virginia. Allied's auditors are in Virginia.

Mem. in Opposition to Motion to Dismiss at 2 (supported by exhibits attached to the memorandum).

Allied argues that this is irrelevant, however, because it transacted *no* business in the Commonwealth in connection with the claims before this Court. It contends that the following facts are established by discovery to date:

The engagement of Raymond, Colesar was accomplished by its client, CAR, a Maine corporation. The majority of Raymond, Colesar's work was performed in Maine. Indeed, Mr. Russell's signature on the purported engagement letter attached to the complaint was obtained in a meeting in Washington, D.C. and no Allied employee ever entered Virginia in connection with Raymond, Colesar's providing services to [Consolidated].

Mem. in Support of Motion to Dismiss at 4–5.

Allied also offers the affidavit of Mr. Russell, who contests several assertions in the pleadings and affidavit offered for RCGH. Russell admits that he first contacted RCGH, but contends that it was RCGH that demanded he sign the engagement letter in question. He also states that RCGH sent all invoices for its work involving Consolidated to Consolidated in Maine, until Consolidated filed for bankruptcy protection.

Allied further argues that any exercise of personal jurisdiction over it in this case would be unconstitutional, in light of *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) and its progeny.

RCGH offers an irrelevant argument about the concept of general versus specific jurisdiction. The applicable portion of Virginia's long-arm statute is by its terms limited to *specific* jurisdiction.

RCGH relies on several facts that are in varying degrees disputed. It affirms its position that Allied frequently contacted RCGH both before and after RCGH agreed to provide services for Consolidated. Allied solicited its services, benefited from them by virtue of its stake in and control over Consolidated, and knew all along that much of the services RCGH provided would involve work done in Virginia. That suffices to show the kind of purposeful direction of activities toward Virginia that are enough to find personal jurisdiction under the Virginia long-arm statute and the Constitution, RCGH argues. *See* Mem. in Opposition to Motion to Dismiss at 14–16.

## III

This motion requires resolution of two questions: 1) does the language of Virginia's long-arm statute reach CSI's conduct? and 2) does the statutory assertion of jurisdiction comport with the due process clause of the United States Constitution? *E.g., Peanut Corp. of America v. Hollywood Brands, Inc.,* 696 F.2d 311, 313 (4th Cir. 1982).

■ It is appropriate to consider affidavits and other discovery in considering

these questions. *See Carter v. Trafalgar Tours, Ltd.*, 704 F.Supp. 673, 674 (W.D.Va. 1989); *Crawford Harbor Assocs. v. Blake Constr. Co.*, 661 F.Supp. 880, 881 (E.D.Va. 1987). Raymond, Colesar bears the burden on this motion of making a prima facie showing that both parts of the test are satisfied. *Crawford Harbor*, 661 F.Supp. at 883. *But see Carter*, 704 F.Supp. at 673 (assuming truth of allegations in complaint for purposes of motion).

Analysis of these questions is complicated, because their resolution turns so on the specific factual situation. *John G. Kolbe, Inc. v. Chromodern Chair Co.*, 211 Va. 736, 740, 180 S.E.2d 664, 667 (1971). Several principles are well settled, however.

First, the "manifest purpose" of Virginia Code § 8.01–328.1(A)(1) is "to assert jurisdiction over nonresidents who engage in some purposeful activity in [Virginia] to the extent permissible under the due process clause." *Kolbe*, 211 Va. at 740, 180 S.E.2d at 667 (construing former law with nearly identical language); *accord Caldwell v. Seabord Sys. R.R.*, 238 Va. 148, 153, 380 S.E.2d 910, 912 (1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1169, 107 L.Ed.2d 1071 (1990).

■ Second, the acts conferring jurisdiction under the statute must coincide with the acts giving rise to the substantive claim. *Virginia Beach v. Roanoke River Basin Ass'n*, 776 F.2d 484, 487 (4th Cir. 1985); *Eastern Scientific Mktg. v. Tekna Seal, Inc.*, 696 F.Supp. 173, 176 (E.D.Va. 1988); *see* Va.Code Ann. §§ 8.01–328.1(A), (B).

Third, no *single* factor is dispositive. The determination whether the statute permits jurisdiction requires examination of both the quantity and quality of the contacts. This involves questions such as who benefited from the contacts, who initiated them and why, whether the contacts involved any person's physical presence in the state, and what further conduct in the forum state was contemplated by the parties.

■ A defendant need not ever physically enter Virginia in connection with the disputed transaction, for example. *See, e.g., English & Smith v. Metzger*, 901 F.2d 36 (4th Cir.1990); *Peanut Corp. of America v. Hollywood Brands, Inc.*, 696 F.2d 311 (4th Cir.1982); *Nan Ya Plastics Corp. U.S.A. v. DeSantis*, 237 Va. 255, 377 S.E.2d 388, *cert. denied,* 492 U.S. 921, 109 S.Ct. 3248, 106 L.Ed.2d 594 (1989); *cf. Pittsburgh Terminal Corp. v. Mid Allegheny Corp.*, 831 F.2d 522 (4th Cir.1987) (defendant need not enter forum state for jurisdiction over it to be constitutional).

■ And in actions arising out of a contract dispute, the place of contract formation and performance is relevant but not dispositive. *Compare Promotions, Ltd. v. Brooklyn Bridge Centennial Comm'n*, 763 F.2d 173, 175 (4th Cir.1985) (long arm jurisdiction "does not extend to a contract [entirely] formed and performed outside Virginia") *and Nan Ya*, 237 Va. at 260–62, 377 S.E.2d at 391–92 (emphasizing in finding jurisdiction that contract formed upon plaintiff's receipt of letter in Virginia) *with Metzger*, 901 F.2d at 39 n. 4 (extent and nature of defendants contacts with Virginia more important than "technical matter" of where contracts form and which law governs them).

■ With the caveat that personal jurisdiction follows a case-by-case analysis, three cases persuade the Court that Allied's motion must be denied. These are *English & Smith v. Metzger*, 901 F.2d 36 (4th Cir.1990), *Peanut Corp. of America v. Hollywood Brands, Inc.*, 696 F.2d 311 (4th Cir.1982), and *Herbert v. Direct Wire & Cable, Inc.*, 694 F.Supp. 192 (E.D.Va.1988).

In *Metzger*, the trial court found there was § 8.01–328.1(A)(1) jurisdiction, where the plaintiff Smith and his law firm sued the California attorney Metzger for breach of a fee sharing agreement.

Metzger called Smith to propose the arrangement, and the two agreed over the phone to do as Metzger proposed. The arrangement required Smith to perform legal services in Virginia, in connection with a civil forfeiture case arising out of criminal prosecutions that Metzger was defending in California. Metzger subsequently

"memorialized" the agreement, by signing and sending a written agreement to Smith in Virginia. Smith received it, signed it, and returned it to Metzger in California. *Metzger*, 901 F.2d at 37.

The parties exchanged "several telephone calls and letters" during their arrangement. *Id.* The deal went sour when Metzger failed to share his fees, and Smith sued. *Id.* at 38. The trial court denied Metzger's 12(b)(2) motion and entered summary judgment for Smith. *Id.*

On appeal, the Fourth Circuit found the circumstances almost identical to those in *Peanut Corporation*, discussed *infra*, and affirmed that personal jurisdiction existed:

> Metzger *initiated the relationship* with Smith, *knowing that Smith was a Virginia lawyer who likely would do the requested work in Virginia.* Metzger contracted with Smith in Virginia, first by telephone and later in a writing that Smith, as the last party to sign, executed in Virginia. *Smith performed all of his duties* under the contract *in Virginia.* Finally, *the parties exchanged numerous telephone calls and written communications.* Few examples of transacting business are more classic than Metzger's decision to associate a Virginia law firm on a case and his subsequent dealings with that law firm. Because Metzger transacted business in Virginia, and because Smith's cause of action arose directly from those activities, the Virginia long-arm statute is satisfied.

*Id.* at 39 (footnote omitted, emphasis added).

The court noted that the parties disagreed about when and where the contract was actually formed. Metzger insisted that the memorandum which Smith signed in Virginia was "without jurisdictional significance." *Id.* at 39 n. 4. The court felt that the contract or contracts (oral or written) were both formed in Virginia, but noted that in any case:

> [S]uch an analysis is unnecessary. What is more important is the extent of Metzger's contacts with Virginia, not whether, as a technical matter, the contracts

were formed there and Virginia law governs.

*Id.* The court also went on to hold that personal jurisdiction was constitutional. *Id.* at 39–40.

In *Metzger*, then, the defendant never physically set foot in Virginia, and in fact had no other business contacts with this state. But there was § 8.01–328.1(A)(1) jurisdiction, because the defendant actively solicited and sought the agreement of a Virginia plaintiff to render services in Virginia, for defendant's benefit, and followed up on the initial service agreement with numerous calls and letters.

Here, Allied concedes that it solicited RCGH's services. The engagement letter Russell signed repeatedly refers to the addressee (Allied) as if it is the client. Allied kept in touch with RCGH, and in fact acted like it was the client.

In *Peanut Corporation*, the trial court found personal jurisdiction when Virginia plaintiffs sued an Illinois defendant over breach of a contract.

The Illinois defendant Hollywood Brands, Inc. made and distributed peanut-filled candy bars. After its processing operations were destroyed by fire, the owner of the plaintiff Virginia peanut processors contacted Hollywood to ask if it would want to purchase some peanuts. *Peanut Corp.,* 696 F.2d at 312.

Hollywood sent two purchase orders to the plaintiffs in Virginia. The second served as the basis for a peanut supply contract, along with a third order which slightly varied terms of the second. *Id.* at 313.

Hollywood and the plaintiffs sent correspondence back and forth, in addressing a conflict over Hollywood's expected performance. Hollywood eventually decided that it had ordered enough peanuts to fulfill its obligations. It sent a letter to the Virginia plaintiffs indicating this, and suit followed. *Id.*

The Fourth Circuit again affirmed the finding of personal jurisdiction:

> *Although Hollywood argues that it had no contacts with Virginia concern-*

*ing the disputed contract, the modification letter,* which became a part of the basic contract, *was addressed to and received by IMA in Virginia, telephonic negotiations occurred with one of the participants located in Virginia, and numerous written communiques* between the parties *were sent to and received in Virginia.* There was sufficient "contracting" in Virginia to amount to the transaction of business from which the cause of action arose. Plaintiffs' cause of action was a direct result of Hollywood's transaction of business within Virginia, and so the requirement that the cause of action arose from the transacting of the business was clearly satisfied.

*Id.* at 314 (citations and footnote omitted, emphasis added).

The court also affirmed that jurisdiction comported with due process. *Id.* It added that the scope of Virginia's long-arm statute is co-extensive with due process, suggesting that when § 8.01–328.1(A)(1) is satisfied, then due process also is. *See id.* at 313, 314 n. 2.

In *Herbert,* the district court held there was personal jurisdiction over Pennsylvania defendants arising out of an employment contract made with the Virginia plaintiff. Defendants were the corporation Direct Wire & Cable, Inc. and Carl Spicer, the company's president and chief executive officer. *Herbert,* 694 F.Supp. at 192.

The court found jurisdiction based on the following facts:

[P]laintiff received at his Virginia mailing address Spicer's July 16, 1982 letter offering him a position as manufacturer's representative for Direct Wire, Spicer's February 16, 1987 letter purporting to change the terms of Herbert's sales commissions, and Spicer's March 16, 1987 letter purporting to terminate Herbert's employment with Direct Wire. In addition, Herbert regularly received his commission checks in Virginia and discussed

the terms and conditions of his employment with Direct Wire by phone from Virginia.

*Id.* at 195;[2] *see also Nan Ya Plastics,* 237 Va. at 261–62, 377 S.E.2d at 391–92 (§ 8.01–328.1(A)(1) jurisdiction found where defendant "aggressively" recruited employment of Virginia plaintiff by directing calls, letters and airplane ticket to plaintiff, and resulting employment contract deemed accepted in Virginia).

Allied relies heavily on two legal principles and a factual argument for its motion.

First, Allied notes that phone calls, telexes and letters are not enough to create personal jurisdiction. *See* Mem. in Support of Motion to Dismiss at 5–6. That is not entirely inaccurate, but is too broad a statement, in that the case law indicates that such communications *alone* are insufficient. *See Promotions Ltd. v. Brooklyn Bridge Centennial Comm'n,* 763 F.2d 173 (4th Cir.1985); *Processing Research, Inc. v. Larson,* 686 F.Supp. 119 (E.D.Va.1988); *Unidyne Corp. v. Aerolineas Argentinas,* 590 F.Supp. 391 (E.D.Va.1984); *Williams Crane & Rigging v. B & L Systs., Ltd.,* 466 F.Supp. 956 (E.D.Va.1979).

In *Brooklyn Bridge,* for example, the Fourth Circuit affirmed that there was no statutory ground for personal jurisdiction over New York defendants where the Virginia plaintiff initiated contact with them in New York, and the defendants apparently made no more than two or three calls or letters to the plaintiff, in response to his suggestions that defendants sell parts of the Brooklyn Bridge as a promotional scheme. *See Brooklyn Bridge,* 763 F.2d at 174–75.

Here, by contrast, there is evidence that Allied initiated many contacts with RCGH, in connection with a project that would require RCGH to do a noticeable amount of its work in Virginia.

Similarly, in *Larson,* the district court found no personal jurisdiction in a contract action involving a plaintiff Virginia buyer

---

**2.** This case is distinguishable from *Herbert,* however, on two grounds. First, there is no allegation or evidence that RCGH regularly received checks here from Allied. Second, although the court did not purport to rely on this fact, defendant Spicer in *Herbert* admitted to visiting Virginia at least twice, to work with the plaintiff Herbert. *Herbert,* 694 F.Supp. at 193.

who responded to a Colorado defendant's "for sale" advertisement in a national trade journal. The court emphasized that the resulting contract of sale was deemed by its own terms to be made in Colorado and construed according to Colorado law, and that the contract arose only because the defendant responded to the plaintiff's inquiries, and signed a purchase contract and down payment check which the plaintiff had made in Virginia.[3] *Larson*, 686 F.Supp. at 120–121.

In *Unidyne*, the district court found that it had no § 8.01–328.1(A)(1) personal jurisdiction over an Argentinean airline which did not serve or fly in Virginia, and directed only a few letters, calls and telexes to the Virginia plaintiff, in response to the plaintiff's calls about problems in the delivery and subsequent repair of a package which the defendant had carried only to New York, before handing over to a domestic carrier. *Unidyne*, 590 F.Supp. at 392–93.

In *Williams Crane*, a Delaware corporation based in Pennsylvania phoned the Virginia plaintiff for quotes on the price of renting a crane from the plaintiff. The defendant corporation accepted the quoted rate, and mailed a confirming letter from Pennsylvania to Virginia requesting performance *entirely* within the state of West Virginia, where the crane was to be used. *Williams Crane*, 466 F.Supp. at 956; *see also Viers v. Mounts*, 466 F.Supp. 187 (W.D.Va.1979) (no personal jurisdiction where Kentucky defendants held preliminary negotiations in Virginia with Virginia plaintiffs, to build defendants a house in Kentucky, but the written contract was wholly executed, performed and breached in Kentucky); *cf. V & V Mining Supply, Inc. v. Matway*, 295 F.Supp. 643 (W.D.Va. 1969) (no jurisdiction where Pennsylvania defendant initiated contact, but resulting contract calling for Virginia plaintiff to deliver mining equipment to Pennsylvania was negotiated and completed in Pennsylvania).

Here, RCGH has put on prima facie evidence that Allied *initiated* contact with RCGH, and agreed to an arrangement whereby RCGH would clearly *perform* a substantial part of its services *in Virginia*, for Allied's benefit. Allied also initiated several contacts with RCGH both before and after the drafting of the engagement letter, which is supposed to be a contract or guarantee agreement. RCGH offers evidence that Allied demanded a say in and some control over the services rendered to Consolidated. *See* Glaspy Aff. at paras. 2–7; Plaintiff's Exh. 2 ("fax" transmission from Allied's Frederick Russell to RCGH, apparently giving RCGH information about Consolidated's accounting concerns and needs).

In a sense, Allied contends there is no personal jurisdiction because there was never any real or implied contract between the parties. Neither side briefed the merits of this dispute, and dismissal on personal jurisdiction grounds is improper if based on such an argument. *See Carter v. Trafalgar Tours, Ltd.*, 704 F.Supp. 673, 674 n. 2 (W.D.Va.1989) (where jurisdictional facts and facts central to merits are "intertwined," entire dispute is properly resolved only by proceeding on the merits) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982)).

### IV

■ The Court is satisfied that the statutory requirements of the Virginia long-arm statute are met here. It is also satisfied that the exercise of jurisdiction here is consistent with constitutional due process.

Due process involves the concepts of minimum contacts and fundamental fairness elaborated on at great length in such cases as *International Shoe Co. v. Wash-*

---

**3.** As with most of these cases, the facts tend to cut both ways. Here, as in *Larson*, whatever "contract" arose appears to have been executed outside Virginia, and prepared solely by the Virginia plaintiff.

On the other hand, there is no dispute here that negotiations began at the defendant's request, and there is conflicting evidence as to who demanded that an Allied official sign the engagement letter which forms the basis for these claims. *Compare* Aff. of Archie Glaspy, Jr. at para. 3 *with* Aff. of Frederick L. Russell, Jr. at paras. 12, 15.

*ington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), and *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

The Court knows of no case in which the two-step analysis followed in the Fourth Circuit has found long-arm jurisdiction proper under Virginia Code § 8.01–328.1(A)(1), and then found such jurisdiction unconstitutional. This case should be no different.

The discussion above describes "certain minimum contacts" which Allied had with Virginia, by which it "purposefully availed itself" of the benefits and protection of Virginia law. *See First American First, Inc. v. National Ass'n of Bank Women,* 802 F.2d 1511, 1515–16 (4th Cir.1986) (citing *International Shoe* and *Burger King* ). Those contacts were not "random, isolated, or fortuitous,"[4] and were such that Allied "should reasonably anticipate being haled into court" here. *Id.* at 1516 (citing *World–Wide Volkswagen* and *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)).

Furthermore, there is nothing fundamentally unfair about asserting jurisdiction in this forum. Allied is in a neighboring jurisdiction, not a distant state or country. Virginia has a legitimate interest in adjudicating the dispute here, and RCGH has an interest in obtaining convenient and effective relief. *See Pittsburgh Terminal Corp. v. Mid Allegheny Corp.,* 831 F.2d 522, 529–30 (4th Cir.1987) (quoting *Burger King,* 462 U.S. at 476–77, 105 S.Ct. at 2517–18); *cf. Herbert,* 694 F.Supp. at 196 (constitutional to exercise jurisdiction over one who hires services of entity in contemplation of "continuous interaction" with the entity while it remains resident of forum state) (citation omitted).

Even the possibility that Washington, D.C. law may govern the dispute is insufficient to render this forum fundamentally unfair. *Cf. Metzger,* 901 F.2d at 39 n. 4. This seems especially so here, where there is no indication that there are extremely complex legal issues, or major differences between the laws of each forum.

V

The Court finds the analysis above dispositive, and therefore expresses no opinion about plaintiff's alternative arguments concerning the applicability of Virginia Code § 13.1–758.

The Court therefore DENIES the defendant's motion to dismiss for lack of personal jurisdiction.

And it is SO ORDERED.

---

**4.** Such as in those cases where the defendant merely responds to a Virginia plaintiff's com-munications. *See, e.g.,* cases discussed *supra* pages 12–14.